609 So.2d 377 (1992)
Frances NICHOLS and David Nichols
v.
Grayden TUBB, M.D., Tom McDonald, M.D., and North Mississippi Medical Center.
No. 89-CA-0590.
Supreme Court of Mississippi.
August 19, 1992.
Rehearing Denied December 31, 1992.
*378 W. Wayne Drinkwater Jr., Butler Snow O'Mara Stevens & Cannada, Jackson, William S. Lawson, Tupelo, for appellant.
*379 Cary E. Bufkin, Shell Buford Callicutt & Perry, D. Collier Graham, Jr., Shell Buford Firm, Jackson, Robert K. Upchurch, Thomas A. Wicker, Holland Ray & Upchurch, L.F. Sams, Jr., John G. Wheeler, Mitchell McNutt Threadgill Smith & Sams, Tupelo, for appellee.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
Frances and David Nichols appeal from a jury verdict and judgment in the circuit court of Lee County in favor of Grayden Tubb, M.D., Tom McDonald, M.D., and North Mississippi Medical Center in a malpractice suit. On appeal the Nichols contend there was a discovery violation and erroneous refusal of instructions requested by plaintiffs. We find no error and affirm.

FACTS
On Friday, April 13, 1984, Mrs. Nichols, as a patient, went to Dr. Tubb's office in Fulton, complaining of pain in the left side of her neck. She told him she had not been injured. She had no fever. He did an ear, nose and throat examination, and checked her reflexes. He concluded she had a crick, administered an injection of prednisolone and lidocaine, and prescribed 40 soma compound, a combination muscle relaxant and aspirin. He then told her to return if she did not get to feeling better.
Mrs. Nichols returned Tuesday, April 17, this time complaining of pain in the right side of her neck. She had no fever. He diagnosed her as having an acute fibrositis of the sternocleidomastoid muscle. He gave her another injection, and told her to return if she did not get all right.
She returned Monday, April 30, this time complaining of her right knee, which was swollen. She had no fever, and again told him that she was still having trouble with her neck. Dr. Tubb noticed that her knee was puffy, and Mrs. Nichols told him she had experienced congestive heart failure with the birth of her last child eleven or twelve years earlier and had to take digitalis for two years, and was advised not to have any more children. Dr. Tubb silently concluded this was probably her problem, but in order not to alarm her, said nothing. He termed her problem "idiopathic edema" and treated her with lasix, a first medication in congestive heart failure. He also prescribed meclomen, a non-steriodal anti-inflammatory drug.
Mrs. Nichols returned Wednesday, May 2, complaining of her swollen right knee, and of being nervous. She told him she was tense, anxious, and wanted something for her nerves.
She returned on Saturday, May 12, feeling "extremely bad." She continued to have pain in her neck and knee. He diagnosed her ailments as congestive heart failure and arthritis, and hospitalized her, telling her that if her condition did not improve, he would have to send her to the North Mississippi Medical Center (Medical Center) in Tupelo. X-rays and blood tests showed Mrs. Nichols had a completely obliterated disc space between the C-5/C-6 vertebra, and an elevated white blood count. Dr. Tubb's diagnosis was ruptured disc. While hospitalized in Fulton, Mrs. Nichols used a walker.
Mrs. Nichols' condition did not improve, and on Monday morning, May 21, Dr. Tubb telephoned Dr. McDonald, a neurosurgeon, and she was transferred to North Mississippi Medical Center, where Dr. McDonald first saw Mrs. Nichols in the emergency room, and examined x-rays taken in Fulton on May 13.[1] He noticed a subluxation at the C-5/C-6 level, a slipping of C-5 vertebrate back on C-6 approximately four millimeters, "a little spur" and osteoarthritis, and that the disc space at the C-5/C-6 level was "nearly gone." He made a differential diagnosis of disc rupture caused by tumor, cancer or infection, and ordered a CT scan to be performed the next morning.
On Tuesday, May 22, a CT scan was administered by Dr. Jimmy Trapp, who *380 found obliteration of the disc space at the C5-C6 level and concluded that this area should be evaluated for "bony encroachment on the spinal canal or for [a] herniated cervical disc." Dr. Trapp suggested that Mrs. Nichols return for further scanning because the disc interspace of greatest interest was not fully included on the examination. Dr. McDonald also felt this CT scan was inadequate to make a complete diagnosis, and ordered a myelogram, which he attempted to perform that afternoon. Mrs. Nichols was in such pain, however, the myelogram could not be safely performed. He then ordered a tomogram, which was done and showed the fifth vertebrate had slipped from about four millimeters to a centimeter, and also that there was bone destruction in the upper part of C-6 and lower part of C-5. To adjust this instability, Dr. McDonald ordered a cervical collar, but it was not very effective.
Dr. McDonald had ruled out trauma as a causation, and was still attempting to determine the causation. He ordered a bone scan which was done that afternoon, Wednesday, May 23. Although he had never encountered an infection in this area, he believed she had some type of infection.
In the meantime other tests had been performed and other doctors had been called in consultation. Dr. Antone Tannehill authorized a isotope bone scan and an echocardiogram to explore possible heart problems on May 22. He found no heart problems. Dr. McDonald and Dr. Tannehill discussed possible diagnosis after Tannehill completed his examination of Mrs. Nichols the same day.[2] After reviewing the test results, Tannehill and McDonald agreed that disc space infection was part of their differential diagnosis. Dr. Ben Buchanan, an orthopedic surgeon, aspirated Mrs. Nichols' swollen knee to grow a pyogenic culture. This test revealed Staphylococcus aureus microorganisms, but was not completed until May 25 after Mrs. Nichols was paralyzed.
On Thursday, May 24, at 8:30 p.m., Dr. McDonald put Mrs. Nichols in twenty pounds traction by use of Gardner-Wells tongs, his purpose being to pull against the tight muscles pulling her neck forward, let them relax, re-align her spine, reduce pain and subluxation and stabilize her neck. Pins were put in her skull and the tongs put in place and traction applied. A portable x-ray in the room showed the traction had been properly applied.
Shortly after 9:00 p.m., Dr. McDonald, who was still in the hospital, received a call from Mrs. Phyllis Nolan, a registered nurse on duty, who  according to Dr. McDonald  told him Mrs. Nichols had moved and had pain in her neck, and he told her to "watch her closely" and call him if she had any problems.
At 10:00 p.m. Nolan checked and found that Mrs. Nichols could not grip with her hands. She did not consider this to be a drastic change, and did not notify Dr. McDonald. Nolan continued to monitor Mrs. Nichols' condition during the night, and Debbie Hand, a licensed practical nurse, took over the responsibility of charting her condition. At midnight Hand checked on Mrs. Nichols who "appeared to be sleeping." At 3:00 a.m. Mrs. Nichols told Hand that she had a shooting pain down her neck and back, which was treated with a pain reliever. The 4:00 a.m. notation reads: "[Mrs. Nichols] states arms are weaker. Right grip weak. No grip in left hand. Unable to move legs." No one notified Dr. McDonald of this condition. Nolan returned to Mrs. Nichols' room at 5:30 a.m. and saw her right leg jerking. The nurses' notes read "spouse is holding her right leg as she is having frequent jerking movements that causes severe pain in neck area  at present point she states she cannot move any extremeties  P. Nolan, R.N." Thirty minutes later her legs were still jerking and her temperature was 101 degrees. *381 She reported these findings to Dr. McDonald.
According to Dr. McDonald, at 6:00 a.m. on Friday, May 25, he received a call from Nolan, who told him that Mrs. Nichols had had a sudden elevation of her temperature and could no longer move her arms and legs. He got out of bed and went to Mrs. Nichols' room. He found that she was paralyzed, her legs were jumping, and she had no voluntary movement of the lower extremities. She had no sensation beneath the C-6 level.
Dr. McDonald took her into emergency surgery. The traction was re-applied while she was on the operating table. Surgery at the C-5/C-6 level showed a pocket filled with dark blood with some whiteness appearing to have some pus in it. With a swab he removed about fifteen drops of this substance for analysis. The innerspace was empty. There was no pressure on the spinal cord. He found evidence of bone destruction, a granulation tissue and a thick fibrous mass. He removed pieces of bone debris also for laboratory analysis.
He cut the posterior longitudinal ligament and saw more material epidurally, in front of the dura mater, which also was removed for laboratory examination. He found no lesion or problem with the posterior ligament.
The laboratory results showed that Mrs. Nichols had a staphylococcus aureus infection.
Following Thursday night, May 24, Mrs. Nichols was a quadraplegic.
Suit was filed April 8, 1986, in the circuit court of Lee County against Drs. Tubb and McDonald and the North Mississippi Medical Center for malpractice. Dr. Tubb was charged with failure to properly diagnose Mrs. Nichols, the hospital with improper care, and Dr. McDonald with causing the paralysis in using the tongs as traction.[3]
At trial William Gary, M.D., and Houston Franks, M.D., testified for plaintiffs, and Grayden Tubb, M.D., Tom McDonald, M.D., Robert R. Smith, M.D., and Richard Naef, M.D., testified for the defendants.

PROOF OF MALPRACTICE
William Gary, M.D., a general practitioner, testified Dr. Tubb should have ordered additional x-rays after Lester Willis, M.D., saw a "complete obliteration of the C-6, C-6 disc space" on May 14 from x-rays taken by Dr. Tubb on May 13. He was of the opinion Dr. Tubb should have referred Mrs. Nichols to either a neurosurgeon or an orthopedic surgeon when he became aware of the disc obliteration. Additionally, with the test results revealing an elevated white blood count, elevated sedimentation rate and high temperature combined with the x-ray analysis, he thought Dr. Tubb's standard of care fell below the minimum standard of care in failing to refer Mrs. Nichols to a specialist in Tupelo on May 15 after he had studied the x-rays and test results.[4]
Houston Franks, M.D., a local orthopedic surgeon, testified that Mrs. Nichols suffered from hematogenous osteomyelitis. In his opinion an infection developed in the knee and was carried through the blood stream into cervical spine area. The infection lodged in one of the vertebrae next to the disc space and eroded the disc space. He opined she developed an abscess of the disc space.
In his opinion, it was poor judgment to apply the Gardner-Wells tongs. He believed this traction contributed to the rupture of the abscess which caused pressure on the spinal cord and subsequent paralysis. The traction pressure also compressed tissue preventing blood from circulating in the cervical spine area. Paralysis would have resulted from pressure on the spine or the interruption of blood flow.
Dr. Franks felt that Dr. McDonald could have prevented Mrs. Nichols' paralysis if he had properly diagnosed and treated her condition. Her infection had progressed for six to eight weeks before its discovery when Mrs. Nichols began to experience pain in her neck days before her first visit *382 with Dr. Tubb. Dr. Franks on cross-examination conceded he had never treated cervical disc space infection and never used the Gardner-Wells tongs. Dr. Franks also agreed that Dr. McDonald had no indications of neurological deficits, which would have warranted surgery before it was performed.

DEFENSE
At trial Dr. Tubb testified that x-rays of Mrs. Nichols' cervical spine showed no evidence of infection or bone destruction. They did indicate narrowing of the disc space, which is consistent with a ruptured disc. Furthermore, blood tests and other authorized tests did not reveal any chronic infections. After examining the x-rays and test results, Dr. Tubb thought that Mrs. Nichols had a ruptured disc.
It was Dr. McDonald's opinion that the traction applied to Mrs. Nichols was necessary and properly done, and that it in no way contributed to her problem. No physician who testified was certain what did cause Mrs. Nichols' total paralysis, but it was Dr. McDonald's and Dr. Robert R. Smith's opinion that the infection had caused a thrombosis of the blood vessels leading into Mrs. Nichols' spinal cord and because of the lack of blood supply there was an infarct of the spinal cord at this space resulting in her paralysis.
Dr. Smith was asked from his review of the medical records whether or not there was any injury either caused or contributed to by the application of the cervical traction. He replied, "There is no way traction can cause that." Dr. Smith testified that in his twenty-five years of practice, he had never known of a patient's neck being injured by the use of traction. Dr. Smith is head of the Department of Neurosurgery at the University of Mississippi Medical Center.
Richard Naef, M.D., a specialist in diseases of the nervous system, testified that Mrs. Nichols' paralysis was caused when the spinal cord was damaged by "swelling, loss of tissue and ... inflammation by the adjacent infectious process which affected the dura, ... the bone [and] the disc cartilage ..." There were also symptoms of myelitis and an interruption of blood supply to the spinal cord caused by the infectious process, which contributed to the spinal cord damage.
There was no rupture of an abscess damaging the spinal cord according to Naef. The infectious process extended into the spinal canal which caused vasculitis  inflammation of a blood vessel  and cord damage due to ischemia, a deficiency of blood due to constriction or obstruction of the blood vessel. This caused an infarction, damage to the spinal cord tissue, which was the primary nature of the cord damage.
In Dr. Naef's opinion early indications of Mrs. Nichols' spinal cord inflammation were her complaints of weakness during the attempt to perform the myelogram and on the afternoon of May 24, before the traction was applied, when it was noted that her hand grip was weak.
Dr. Naef stated that if surgery had been performed hours earlier, it would not have prevented spinal cord damage because Mrs. Nichols exhibited "symptoms of spinal cord involvement before the tongs were put on." Application of the Gardner-Wells tongs was proper to prevent further slippage of the vertebrae.
It was also Dr. Naef's opinion that traction did not cause the paralysis and that the disease process leading to paralysis was only progressing on the night of May 24. Mrs. Nichols' complaint of electricity-like pain was "coincidental."
Following trial there was a jury verdict in favor of all defendants. The Nichols have appealed.

LAW
Although no question has been raised on appeal as to whether the verdict was against the overwhelming weight of the evidence, we have nevertheless summarized the facts necessary for some understanding of what occurred in this very serious case, and the contentions of the parties at trial. The record in this case comprises eighteen volumes.
*383 Further reference to the record will be made in discussing the issues raised on appeal.
There are only two issues raised on this appeal, the first being that reversible error was committed in allowing testimony that was not revealed in pretrial discovery as required by the Mississippi Rules of Civil Procedure (MRCP), and the second being the erroneous refusal of instructions requested by the plaintiffs.
The Nichols break the first contention into three parts:
1. the defendants were obligated to fully and seasonably respond to plaintiffs' interrogatories,
2. the circuit court erred in allowing testimony not fully and timely disclosed, and
3. Dr. McDonald did not swear to his supplemental answer to interrogatories, and therefore this response was ineffective.

I. DISCOVERY VIOLATION
It is well known that our Mississippi Rules of Civil Procedure were copied from the Federal Rules of Civil Procedure, and we construe ours as the Federal courts construe the federal rules.
Rule 26(b)(1), (b)(4)(A)(i) MRCP in pertinent parts provide:
(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party... .
.....
(4) Trial Preparations: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows"
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.
Paragraph (b) of Rule 33 MRCP, Interrogatories to Parties, states:
(b) Scope; Use at Trial. Interrogatories may relate to any matters which can be inquired into under Rule 26(b), and the answers may be used to the extent permitted by the rules of evidence.
Rule 33(a), Interrogatories to Parties, requires that:
Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer.
Rule 26(f) deals with a party's duty to supplement his response to requests for discovery:
(f) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons (i) having knowledge of discoverable matters, or (ii) who may be called as witnesses at the trial, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony. (Emphasis added)
(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are *384 such that a failure to amend the response is in substance a knowing concealment.
(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.
In this case the Nichols did not take the deposition of any of the defendants, but depended solely upon pretrial interrogatories.
Rules of discovery are to prevent trial by ambush. In no other area is a litigant more vulnerable to ambush than a plaintiff in a malpractice action against a member of some profession. His lawyer must gain knowledge in totally unfamiliar territory, and as best he can navigate a sea of unknown knowledge. There are rocks, shoals, sandbars familiar to a member of the profession which will likely escape the lawyer's attention unless pointed out to him by a member of that profession. For this very reason lawyers in a malpractice action are tempted to be vague and unresponsive to interrogatories addressed to specialized areas of knowledge.
An ordinary fact which has not been disclosed upon pretrial discovery request will be instantly recognized at trial and objected to. A fact in a technical case may be hidden in some generalized, non-specific answer, with trial counsel solemnly proclaiming at trial that the question was answered, the other side just did not recognize it.
Yet, if trial counsel is not afforded time prior to trial to meet and prepare for a particular defense or contention requiring specialized knowledge to grasp and understand, he is ill-equipped to suddenly do so in the middle of the trial.
For this reason, all courts in administering and applying discovery rules must afford the attorney ample time before trial to receive the names of all experts who will be called at trial and meaningful information about their proposed testimony. Rule 26(b)(4) requires disclosure of "facts known and opinions held by experts," and as to each proposed testifying expert, to state "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." This means that the substance of every fact and every opinion which supports or defends the party's claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial.
Not only this, the "grounds" or basis of each opinion must be disclosed. If the expert's opinion is based upon his own experience, the answer should so state, and if based upon some other ground, the precise source should be likewise disclosed.
If truth is to be attained in the trial process, it is imperative that the attorneys and experts testifying will be fully knowledgeable as to the other party's contentions and claims well in advance of trial.
Over a quarter of a century ago, when Rule 26(b)(4) was promulgated in the Federal courts, the comment noted:
Many of these cases present intricate and difficult issues as to which expert testimony is likely to be determinative.
... .
In cases of this character, a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand... . Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, then the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.
Comments to Rule 26, 28 U.S.C.A.
In Square D Co. v. Edwards, 419 So.2d 1327 (Miss. 1982), we reversed a plaintiff's judgment because the plaintiff's expert was permitted to testify to facts only generally *385 referred to in pretrial discovery. Also, Jones v. Hatchett, 504 So.2d 198 (Miss. 1987); State Highway Comm. v. Havard, 508 So.2d 1099 (Miss. 1987).
The following is the answer of Dr. McDonald to plaintiffs' interrogatory number 10(d), requesting the "substance of facts and opinions" to which his experts were expected to testify:
The Defendant expects to call Dr. Robert Smith, Department of Neurosurgery, University Medical Center, 2500 North State Street, Jackson, Mississippi 39216. The subject matter on which Dr. Smith is expected to testify is the reasonable diligence, skill and prudence practiced by competent neurosurgeons throughout the United States who have available to them the same general facilities, services, equipment and options available to Dr. McDonald at North Mississippi Medical Center in May through August, 1984. Dr. Smith's opinions will be based on his review of the medical records of the Plaintiff, Frances Nichols, and his background, training and experience in neurosurgery. He is expected to testify that the care and treatment rendered by Dr. McDonald to the Plaintiff, Frances Nichols, was in accordance with the applicable standard of care.
On June 30, 1987, the circuit judge entered a pretrial order setting trial for January 18, 1988, and giving the defendants until September 30 in which to supplement their answers to interrogatories. Dr. McDonald's supplemental answers listed four additional experts who would testify, including himself, but again the only information as to any of these experts was that they would testify that Dr. McDonald met the appropriate standard of care and did not do or fail to do anything which caused Mrs. Nichols' paralysis. With the exception of Dr. McDonald, none of these added experts testified at trial.
These answers were as foolish and dangerous as they were arrogant. They contained no more information than a pleading. Had this matter gone to trial with no more answer than this, the circuit judge would have been acting well within his discretion in excluding all the specific facts and opinions which Dr. Smith and Dr. McDonald expressed. Square D. v. Edwards, supra.[5]
Dr. Tubbs listed two experts and gave some information as to their proposed testimony, only slightly more informative than those of Dr. McDonald, but neither was called to testify.
The Nichols are manifestly correct in their contention that Dr. McDonald did not fully respond to the interrogatory on his expert witnesses. This is not the entire story, however.
In October, 1987, the Nichols moved to compel further discovery, which was considered along with other matters at a pretrial hearing on December 10. At the outset the circuit judge stated:
BY THE COURT:
Counsel for the defendants are cautioned and directed to fully respond as fully as you deem necessary in order to avoid an objection being sustained at the trial when the expert testifies.
Defense counsel all protested that the answers supplied were in compliance with the rules of discovery. Following their extended arguments that they had supplied more than ample information, the court held that he was "not going to compel the defendants to supplement any further; however, Mr. Lawson still has the right to *386 object at the proper time if he feels free  if he desires to at that time, and the Court will rule."
The following then appears in the record:
BY MR. LAWSON:
I think that is the remedy provided by the rule, Your Honor.
BY MR. BUFKIN:
Judge, may I inquire? May we have until the first of the year because we've got an intervening Christmas to look at our individual responses and supplement 
BY MR. SMITH:
And supplement if we do desire?
BY THE COURT:
Yes, sir.
BY MR. LAWSON:
I have no objection.
BY MR. BUFKIN:
I say first of the year; let's just say  two weeks before the trial. That's roughly the first of the year, but that would be about the fourth of January.
BY MR. LAWSON:
Okay, y'all have no objection to me having the judge sign an order [about various matters discussed in the conference].

(R. 41-42)
On January 4, 1988, Dr. McDonald filed an extended answer to the Nichols interrogatory number 10 setting forth every relevant fact and opinion that was subsequently testified to at trial. It detailed the examination and treatment of Mrs. Nichols, setting forth times and places of all events. Among other things, it stated:
Dr. McDonald and all of the other expert witnesses which have been previously identified in his supplemental answers to the Plaintiffs' Interrogatories will deny that Dr. McDonald was negligent and it is expected that they will testify that, based upon a reasonable medical probability, Mrs. Nichols had vasculitis or a cervical infarct, neither of which were caused or contributed to by Dr. McDonald's care and treatment ...
(R. 896).
Dr. McDonald did not make oath to these answers. The Nichols did not object to filing the supplemental interrogatories at a late date, did not ask for a continuance, and, with one exception as to a question to Dr. McDonald, noted below, made no objection to the testimony of any defense witness at trial.
Dr. McDonald was called as an adverse witness and at no time during this examination was an objection lodged because of insufficient answer to discovery. When the plaintiffs rested, he testified as a defense witness, during which examination no objection was made as to any discovery violation. During cross-examination by plaintiffs' counsel, he explained the mechanism of an infarct, a closing down of the blood vessels and blockage, all without objection. On cross-examination by counsel for the Medical Center, he again explained the mechanism of an infarct.
Following this explanation in the record, the Medical Center's counsel proceeded, and got the following response:
Q. What does  why does an infarct result?
BY MR. LAWSON:
Your Honor please, excuse me, but we will object to any testimony now, regarding any infarct because there is nothing about an infarct or anything that they are talking about not anywhere in any of the hospital charts. Now, they are introducing a new cause of action I suppose, or cause of defense into this thing; there just isn't any evidence of it.
BY THE COURT:
Objection overruled.
(R. 1466)
If the Nicholses had any objection to the filing of supplemental answers to interrogatories, it should have been voiced at the December, 1987, pretrial meeting, and if the answers were not being filed sufficiently in advance of January 18, 1988, to prepare for trial, counsel should have moved *387 for a continuance. Moreover, there are hundreds of pages of trial testimony by Drs. Tubb, McDonald and Smith, all without objection, with the one exception above noted. Any insufficiency in pretrial discovery was clearly and manifestly waived by the Nichols. Cummins v. Century 21 Action Realty, 563 So.2d 1382, 1386 (Miss. 1990); Moore v. Moore, 558 So.2d 834, 838 (Miss. 1990); Griffin v. State, 557 So.2d 542, 557 (Miss. 1990); Jackson v. State, 551 So.2d 132, 147 (Miss. 1989).
The Nichols final contention on pretrial discovery is that Dr. McDonald did not make oath to the answer to interrogatory number 10 filed January 4, 1988. This, too, was waived by counsel making no objection to Dr. McDonald's testimony at trial on this (or any other) basis, Cummins, supra; Moore, supra; Griffin, supra; Jackson, supra.

II. "REFUSED" INSTRUCTIONS
The Nichols' complaint on appeal that the circuit judge erroneously refused and substituted requested plaintiffs' instructions is as far off the record as their contention on discovery violations.[6]
When both sides had rested, the following portions of the record show what transpired in reference to the instructions:
BY THE COURT:
All right. Gather your proposed instructions up and let's look at them first in chambers, and then after we weed some out, withdraw some, etc., get back out here and we will make a record on the instructions and objections thereto.
There followed in chambers motions by all defendants and then by the plaintiffs for directed verdicts, which the court overruled. The circuit judge then announced, "Court will be in recess until 8:00 in the morning at which time we will go over these instructions."
The record begins the next day with the following:
OBJECTIONS TO INSTRUCTIONS
BY THE COURT:
All right. As to the proposed Court's instructions that we have reviewed in chambers, do the Plaintiffs have any objections thereto? (Emphasis added)
(R. 1926)
There was no objection by the plaintiff. The circuit judge then turned his attention to the plaintiffs' requested instructions:
INSTRUCTION NO. P-1
BY THE COURT:
All right. Let's go to the Plaintiffs' instructions, P-1. Mr. Bufkin is there any objection by Defendant Tubb to P-1?
Dr. Tubb's counsel objected to P-1, and the court then asked about Instruction P-2, to which all defendants objected. Following this the court announced:
BY THE COURT:
P-1 and P-2 will be given. Objections will be noted.
The circuit judge then went through each of the instructions requested by plaintiffs, namely instructions P-3 through P-7, and after hearing all objections voiced by the various defendants, overruled them all and granted each of the instructions requested by plaintiffs.
The court then went through the remaining instructions requested by the defendants, and after hearing objections by plaintiffs' counsel ruled on the defense instructions.
When all counsel had been given an opportunity to be heard on the requested instructions and objections, if any, thereto, the record shows the following:
BY THE COURT:
Do y'all need a few minutes to get your thoughts together, or are you ready to proceed?
BY MR. LAWSON:
We're ready, your Honor.

*388 BY THE COURT:
Let's take about three minutes while I organize these instructions into some type of reasonable chronological order.
(RECESS)
BY THE COURT:
Let the record reflect that there have been numerous instructions withdrawn. Notation has been made thereon, and they will remain as a part of this file. Also, there have been requests for instructions on punitive damages. Those instructions have been refused since the Court is not of the opinion that this case warrants the giving of any instructions on punitive damage or any award thereon.
BY MR. BUFKIN:
Your Honor, the Court didn't mention our requested peremptory instructions. I assume those are all in the Court's hands and have been refused.
BY THE COURT:
Yes. In addition to those that have been withdrawn, there are numerous instructions that have been refused. And the Court has indicated that on the instruction itself, and they will not be a part of this record. We intend, or I am allowing counsel a total of two and a half hours in closing arguments.... (emphasis added)
With this record background, the Nichols' complain on appeal that the circuit court "erroneously" refused jury instructions requested by them, and substituted "impermissibly abstract" instructions. They list "proposed" instructions P-1, P-2, P-3, P-4, P-5, P-6 and P-11. While these instructions which they complain were erroneously "refused" appear in the record, none is stamped as "filed," and instructions P-4, P-5 and P-6 show they were withdrawn, and P-1, P-3 and P-11 are marked "refused."
The Nichols' counsel made no record whatever as to these instructions. Counsel did not mention them, or call any of them to the attention of the court during the hearing in chambers on the instructions. If there had been any confusion or oversight over the absence of any discussion of them in the record, counsel also had an opportunity to call them to the attention of the court in a motion for a new trial, request a hearing thereon, and make a proper record of precisely what occurred in reference to these instructions.
As this record shows, every single instruction requested by the plaintiffs on the record was granted. Appellate counsel asks us to speculate as to the others. This Court has no way of knowing what occurred in reference to them. It is of concern to this Court that counsel would ask us to surmise as to instructions which were never presented to the circuit court for a ruling on the record. It is in poor grace when experienced and able counsel are afforded an opportunity to make a clear and unambiguous trial record do not see fit to do so, yet claim some alleged error from an incomplete, ambiguous or uncertain record they were at least partly responsible in creating in the first instance. If counsel for any party wants a circuit judge to consider a proposed instruction, it is his duty to submit such instruction on the record, and have the court make a ruling thereon on the record. Any error predicated upon the granting or refusing of an instruction must come from an instruction presented to the circuit court on the record, and a ruling thereon made on the record.
In Vinson v. Johnson, 493 So.2d 947, 950 (Miss. 1986), we held:
This Court simply refuses to review any allegation of error which is unsupported by the record. We have stated this upon innumerable occasions.
Generally a court reporter is available there in court for a party to see that a proper record is made. In the event there is no court reporter, or the court reporter fails to make a proper record, or accurate record, the party can prepare a bill of exceptions. (Emphasis added)
What we have said in this opinion about the necessity of making a record of any alleged error is a belabored repeat of the obvious. Because attorneys continue to allege in briefs facts on which a record is blank, we are constrained to once again make the point. If something *389 happens in a trial court about which a party feels aggrieved, he will not be allowed to complain of it on appeal unless he gets it in the record.
Nor is this a case, as counsel would have it, in which a party submitted an erroneous instruction which the court refused without reforming it, thereby leaving the jury uninstructed on a crucial legal issue. Byrd v. McGill, 478 So.2d 302 (Miss. 1985). In this case all plaintiffs' instructions requested on the record were granted and they fairly and fully instructed the jury on the legal issues from which the jury was to determine the facts.
Finding no error, we affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., PRATHER, ROBERTSON, PITTMAN and BANKS, JJ., concur.
SULLIVAN, J., dissents with separate written opinion joined by McRAE, J.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
SULLIVAN, Justice, dissenting:
Under the authority of our decision in McCullom v. Franklin, 608 So.2d 692 (1992), I would reverse and remand this case. I therefore dissent.
McRAE, J., joins this dissent.
McRAE, Justice, dissenting:
Upon reading the record, it becomes apparent that most of the appellants' wounds are self-inflicted. The outcome of this case would undoubtedly have been far different had trial counsel been more vigilant. Accordingly, I join Justice Sullivan's dissenting opinion.
I would go further, however, and hold that the case should be reversed as to the defendant, McDonald, on grounds of properly preserved error. Dr. McDonald's initial answers to the plaintiffs' interrogatories, as the majority correctly notes, were woefully inadequate under our rules of civil procedure. McDonald never filed a valid supplementation, and the plaintiffs raised a timely objection at trial to McDonald's testimony concerning pertinent matters which McDonald's answers to interrogatories failed to address. The majority errs in holding that the plaintiffs waived McDonald's failure to file an appropriate response to interrogatories.
The plaintiffs propounded to Tom McDonald an interrogatory which requested the "substance of facts and opinions" concerning the testimony of his experts. McDonald's response stated that the experts, not he, would testify that McDonald's treatment "was in accordance with the applicable standard of care." Nowhere does the answer state which standard of care the experts would apply; nor does it discuss the specifics of how, in the opinion of the potential experts, Dr. McDonald's treatment met the "applicable standard of care." Dr. McDonald's answer to the plaintiffs' interrogatory thus fell far short of the requirements of MRCP Rule 26(b)(4)(A)(i) which requires the respondent to "state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." It is true that Dr. McDonald filed a supplemental response in January 4, 1988, which provided more specific answers to the plaintiffs' interrogatories, and also for the first time included himself as an expert. He can say that he just realized he was an expert on January 4, 1988. He and his attorney knew that he would give an expert opinion in this case from Day One. This supplemental response was ineffective, however, for three reasons: (1) it was untimely; (2) the court did not grant McDonald permission to file a tardy supplementation; and (3) it was unsworn.
MRCP Rule 26(f)(2) states that "[a] party is under a duty seasonably to amend a prior response if he obtains information" which renders the initial response inadequate or where "a failure to amend the response is in substance a knowing concealment." "Seasonably" does not mean several months later. It means immediately. McDonald propounded his blatantly inadequate answers to plaintiffs' interrogatories on August 27, 1986. Thus, well over one *390 year passed before he filed a more detailed response. Clearly, McDonald's supplemental answers were unseasonable and therefore did not bring his discovery responses into compliance with Rule 26.
The majority finds that the plaintiffs waived McDonald's failure to file a seasonable supplemental answer when, at the pretrial conference, counsel for the plaintiff stated that he had "no objection" to allowing supplementation as late as the first of 1988. The majority neglects to note, however, that the trial court granted an extention of time to supplement only to Dr. Tubb (represented by attorney Bufkin) and Dr. Willis (a defendant, represented by attorney Smith, who was subsequently dismissed from the suit). Dr. McDonald did not request an extension and was not granted one. He therefore had no authority or leave to file his untimely supplementary answers to interrogatories on January 4, 1988. To compound his error, he did not even submit his attempted supplementary responses under oath as required by MRCP Rule 33(a). Clearly, the answers Dr. McDonald filed on January 4, 1988 were absolutely invalid and to no avail. For our purposes in reviewing this case, we should treat them as if they did not even exist.
The majority also concludes that if the plaintiffs had wished to have more time after the January supplementations to prepare for trial, they should have moved for a continuance. This proposition is soundly defeated by Huff v. Polk, 408 So.2d 1368 (Miss. 1982), wherein this Court held where a party files a tardy discovery response, the other party does not waive the discovery violation by failing to seek a continuance.
At trial, Dr. McDonald testified as an expert in his own behalf. While being examined by the Medical Center's counsel, he stated that Frances Nichols' injury resulted from an "infarct," or a closing down and blockage of blood vessels, and not from his treatment methods. Counsel for the plaintiffs interposed an objection:
Your Honor please, excuse me, but we will object to any testimony now, regarding any infarct because there is nothing about an infarct or anything that they are talking about not anywhere in any of the hospital charts. Now, they are introducing a new cause of action I suppose, or cause of defense into this thing; there just isn't any evidence of it.

Articulate it is not, but there can be little doubt that this objection addresses defendant McDonald's failure to adequately divulge the substance of his proposed testimony in discovery. The trial court should have sustained the objection and instructed Dr. McDonald not to testify concerning facts not disclosed in his responses to the plaintiffs' discovery requests. The trial court's failure to do so constitutes reversible error. Square D Co. v. Edwards, 419 So.2d 1327 (Miss. 1982) (allowing expert to testify to facts only generally referred to in pretrial discovery requires reversal).
I would reverse and remand as to the plaintiffs' action against Dr. McDonald on grounds that the trial court should not have permitted McDonald to testify concerning facts not disclosed in response to plaintiffs' discovery requests. I would reverse and remand the entire case in accordance with McCollum v. Franklin, 608 So.2d 692 (1992) as proposed by Justice Sullivan.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] Dr. Tubb testified Mrs. Nichols, for the first time, told him on May 21 that she had injured her knee in the course of her employment. Mrs. Nichols disputed this, testifying she informed him that she had hurt her knee on the job during her first visit.
[2] Dr. Tannehill dictated a report on May 23, transcribed on May 25, which stated under the heading Diagnosis:

Impression: 1) Arthritis,? infectious, consider granulomatous ( vergus fungal), cervical spine and right knee, consider possible bacterial etiology (however afebrile), 2) Hypertension, 3) Mild cardiomyopathy of pregnancy by history, 4) Obesity.
[3] Others were also sued, but later dismissed on motion of the plaintiff.
[4] Dr. Tubb disputed Dr. Gary's conclusion that Mrs. Nichols had any fever.
[5] No scientific, professional or technical journal would consider publication of any article which did not contain the basis for every statement of fact, hypothesis or opinion made or advanced by the author. The reason for this is that in order for the article to be of any value to the reader, it must be reliable and trustworthy. And, in order to insure its reliability every statement of fact, opinion or conclusion must be subject to testing. Therefore, every such article tells the reader how the author arrived at each conclusion, namely: by testing, experiments, his own experience, or from other reputable publications or published data.

It would be inconceivable that two reputable scientists or professional men would appear at a seminar in their field to advance opposing points of view without each being given advance notice of the full basis for the opinion of the other. The search for truth in a trial requires no less.
[6] The appellants' briefs were prepared by appellate counsel who took no part in the trial of this case. It is difficult to believe trial counsel would make the same contentions made by appellate counsel.