ISHEE, J„
 

 for the Court:
 

 ¶ 1. Thermon Arrington was convicted of manslaughter in the death of Shasta Smith. Arrington shot Shasta in the neck during an argument at a birthday party. A previous trial of Arrington for Shasta’s death resulted in a mistrial. Arrington was sentenced as a habitual offender to twenty years in the custody of the Mississippi Department of Corrections (MDOC)
 
 *544
 
 without eligibility for parole or probation. Arrington submits three issues for our review: (1) whether his double-jeopardy rights were violated because of a jury instruction, (2) whether the trial court erred in denying a mistrial during voir dire, and (3) whether the trial court erred in denying a directed verdict and by not granting a judgment notwithstanding the verdict (JNOV) and a new trial. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. A birthday party was held on September 21, 2008, at the home of Addie Carol Smith, the mother of the victim, Shasta. Addie was hosting the party for her oldest daughter, Trina Smith. There were ten to fifteen people at the party in Newton, Mississippi, with most of the guests being members of Shasta’s family. Arrington was at the party as a guest of Shasta’s sister, Renee Smith. As the party progressed, alcohol was consumed by the various party goers. Shasta and his brother, Willie Joe Smith, began arguing; because of this, Shasta and Renee made Willie Joe leave the party. At approximately 5:00 p.m., Shasta and Arrington had an argument outside Addie’s home. Shasta’s sister, Valencia Burton, attempted to disrupt the argument by walking Shasta away from the house down a hill to his sister’s house. At this point, there is a disagreement as to what happened next. All of the State’s witnesses testified that Arrington went to his car, retrieved a pistol, and shot the pistol once in the air. He then approached Shasta and Valencia and stood between them trying to cool down the argument. Some of the State’s witnesses, who had seen the killing, testified that Shasta was unarmed. Arrington said Shasta had a red-handled hunting knife. Valencia confirmed Shasta had a knife, but she testified that he dropped it to his side well before he was shot, and Shasta never used it in a threatening manner toward Arrington. Officers with the Newton Police Department who investigated the scene never found a red-handled hunting knife.
 

 ¶ 3. Valencia said as Arrington was approaching them, she kept pushing Shasta away from Arrington until she and Shasta were against the house. After Arrington had pushed Valencia out of the way, Ar-rington and Shasta were face to face. The State’s witnesses testified that Arrington put the gun to Shasta’s face, and Shasta told Arrington to get the “f* ⅞ * out of [his] face” and slapped the gun down. Ar-rington maintained Shasta had a red-handled hunting knife. Valencia testified that Shasta had the knife, but he held it at his side at all times. Arrington told Shasta: “B* ⅜ * * * *, I’m going to kill you,” and Shasta replied: “Well if you are gonna do it, do it.” Arrington then put the gun to Shasta’s neck and shot him. Shasta did not die immediately but succumbed to his injury several days later at the local hospital. After he shot Shasta, Arrington fled the scene and drove to Meridian, Mississippi, where he spent the night in a motel room. After talking with his father, Ar-rington returned to Newton the following day and turned himself in to the authorities.
 

 ¶ 4. Arrington was charged with murder as a habitual offender. At his first trial in August 2009, the jury deliberated for twelve hours and then reported to the trial judge that it was hopelessly deadlocked. The trial judge declared a mistrial. At the second trial held on April 8, 2010, the jury returned a guilty verdict of manslaughter after deliberating only thirty-one minutes. During sentencing, at the habitual-offender hearing, the State produced evidence of eleven felony convictions that the forty-five-year-old Arrington had committed in
 
 *545
 
 the State of Florida. The trial judge then sentenced Arrington to the maximum twenty-year sentence for manslaughter without eligibility for parole or probation.
 

 ¶ 5. The trial court overruled Arring-ton’s post-trial motions for a JNOV and a new trial. Arrington now appeals.
 

 ANALYSIS
 

 I. DOUBLE JEOPARDY
 

 ¶ 6. Arrington argues that the trial court erred by refusing a manslaughter instruction in his first trial and only submitting a murder instruction. Arrington claims by refusing a manslaughter instruction in the first trial and allowing one in the second trial, the trial judge violated Arrington’s constitutional right against double jeopardy. Arrington claims by not submitting the manslaughter instruction in the first trial, the trial judge “acquitted Mr. Arrington of manslaughter”; and since he was “acquitted” of manslaughter, his trial and conviction of manslaughter in the second trial were barred by double jeopardy, and he could not be “twice put in jeopardy of life or limb” for the same offense. U.S. Const. amend. V. Arrington cites
 
 Watts v. State,
 
 492 So.2d 1281, 1284 (Miss.1986), for the proposition that if a mistrial is granted upon the court’s motion, a second trial is barred by double jeopardy, unless taking into consideration all of the circumstances there was a “manifest necessity” for the mistrial. This is a correct statement of the law. However, Arrington’s double-jeopardy argument fails on so many fronts that it is not necessary to reach a “manifest-necessity” analysis in the instant ease.
 

 ¶ 7. His argument fails primarily because he has not supplied us with a record on which we can decide his assigned error. We simply do not have the benefit of the record of the first trial to know why any of the instructions were given or denied. The part of the first trial that would have set out the discussion of the instructions given or denied was not designated by Arrington for inclusion in the appeal record. Of course, each party is responsible for designating the content of the trial record that he or she determines should be included in the appellate record. M.R.A.P. 10. It was Arrington’s responsibility to ensure that his appellate record was sufficiently made so this Court could analyze his alleged errors. Arrington urges this Court to make decisions regarding jury instructions in the first trial without designating the record of the first trial and, more specifically, the arguments and judicial rulings on the instructions. Instead, all that is in the appeal record regarding instructions from the first trial are five documents with the heading of the trial court case and each marked “jury instruction” and showing a file stamp of the Circuit Clerk of Newton County dated August 10, 2009, the date of the first trial. Four “instructions” appear to have the marking “refused” at the bottom, and we are unable to read what is written at the bottom of the fifth “instruction.”
 

 ¶ 8. We must decide cases on appeal by the facts shown in the record, not by assertions in the parties’ briefs.
 
 Oakwood Homes Corp. v. Randall,
 
 824 So.2d 1292, 1298 (¶ 8) (Miss.2002) (citation omitted). In an opinion containing facts similar to those in this case, the Mississippi Supreme Court declined to review an allegation that the trial court erroneously refused to give the plaintiffs’ jury instructions.
 
 Nichols v. Tubb,
 
 609 So.2d 377, 388 (Miss.1992). The supreme court ruled that the appellants made no record whatsoever about the refused instruction; therefore, the appellate court was not required to consider the issue.
 
 Id.
 
 The supreme court stated if there had been confusion or error
 
 *546
 
 on the part of the trial court, then counsel for the appellants should have made “a proper record of precisely what occurred in reference to these instructions.”
 
 Id.
 
 The supreme court also said that without a record, the appellants’ counsel was asking the court “to speculate” about what had occurred at the trial level regarding the instructions since the court had “no way of knowing what occurred in reference to them.”
 
 Id.
 
 The supreme court further noted that counsel should not ask the court to surmise about jury instructions.
 
 Id.
 
 “It is in poor grace when experienced and able counsel are afforded an opportunity to make a clear and unambiguous trial record [and] do not see fit to do so, yet claim some alleged error from an incomplete, ambiguous[,] or uncertain record” which they are responsible for submitting on appeal.
 
 Id.
 
 After admonishing counsel, the supreme court addressed the importance of preserving jury instructions for appeal, stating:
 

 If counsel for any party wants a circuit judge to consider a proposed instruction, it is his duty to submit such instruction on the record, and have the court make a ruling thereon on the record. Any error predicated upon the granting or refusing of an instruction must come from an instruction presented to the circuit court on the record, and a ruling thereon made on the record.
 

 Id.
 

 ¶ 9. Arrington has obviously ignored the precedent noted above that the burden is on him as the appellant to demonstrate why the trial court was in error. Because we presume the decisions of the trial courts are correct as seen in
 
 Robinson v. State,
 
 345 So.2d 1044, 1045 (Miss.1977), we find no merit to this alleged error.
 

 ¶ 10. Arrington’s double-jeopardy argument also fails because it was not included in his motion for a JNOV or new trial. '“We need not consider matters raised for the first time on appeal, which practice would have the practical effect of depriving the trial court of the opportunity to first rule on the issue, so that we can then review such trial court ruling under the appropriate standard of review.”
 
 Stephens v. Miller,
 
 970 So.2d 225, 227 (¶ 9) (Miss.Ct.App.2007) (quoting
 
 Alexander v. Daniel,
 
 904 So.2d 172, 183 (¶ 26) (Miss.2005)).
 

 ¶ 11. Finally for double jeopardy under the Mississippi Constitution to bar a second prosecution, there must be an actual conviction on the merits. The plain language of the state constitution reads as follows: “No person’s life or liberty shall be twice placed in jeopardy for the same offense;
 
 but there must be an actual acquittal or conviction on the merits to bar another prosecution.”
 
 Miss. Const. Art. 3 § 22 (emphasis added). As the supreme court said in
 
 State v. Fleming,
 
 726 So.2d 113, 115 (¶ 9) (Miss.1998), before an accused can claim a violation of the state’s Double-Jeopardy Clause, “the accused must first suffer an actual acquittal
 
 or
 
 conviction on the merits of the offense.” Arrington’s first trial ended in a mistrial because the jury could not reach a verdict after lengthy deliberations. There was no conviction. Therefore, Arrington could not be placed in jeopardy again at his second trial. Instead, Arrington was simply retried.
 

 ¶ 12. For all of these reasons, we find Arrington’s rights under the federal and state Double-Jeopardy Clauses were not breached, and this issue is without merit.
 

 II. MISTRIAL
 

 ¶ 13. After the State had finished its voir dire of the jury venire but before counsel for Arrington began his voir dire, Arrington blurted out that his counsel,
 
 *547
 
 Bobby Everett, was “biased.” His remark appears in the record after the prosecution had completed its voir dire. The record reflects:
 

 BY THE COURT: Voir dire for the defendant.
 

 BY THE DEFENDANT: Your Hon- or, he is biased. Mr. Bobby Everett is biased.
 

 BY THE COURT: Approach the bench.
 

 (CONFERENCE HELD AT BENCH OUT OF HEARING OF JURORS)
 

 BY THE COURT: He’s what?
 

 BY THE DEFENDANT: Biased.
 

 BY THE COURT: What did you say?
 

 BY THE DEFENDANT: I say Mr. Bobby Everett is fired.
 

 BY THE COURT: He’s what?
 

 BY MR. EVERETT: Fired.
 

 BY THE DEFENDANT: Fired. FI-R-E-D. Fired.
 

 BY THE COURT: I don’t know what he’s saying.
 

 BY MR. EVERETT: He’s saying I’m biased about something. I don’t know what happened.
 

 BY THE COURT: About what?
 

 BY THE DEFENDANT: He’s not giving me, representing me to the fullest of his ability.
 

 BY THE COURT: Well, you sit in the chair. You’ve been in this trial before. You hired Bobby Everett, didn’t you?
 

 BY THE DEFENDANT: Uh-huh.
 

 BY THE COURT: He’s your lawyer!,] and he’ll represent you in this case. Bobby is not a biased man. He represents his clients the best [sic] of his ability.
 

 BY THE DEFENDANT: Uh-huh.
 

 BY THE COURT: So he’ll represent you in this case.
 

 BY THE DEFENDANT: He’ll represent me in this case?
 

 BY THE COURT: Yes, sir.
 

 BY THE DEFENDANT: I don’t want him.
 

 BY THE COURT: I don’t care if you want him or not, you’ve got him. Your case is set for trial — we’ve already started.
 

 BY THE DEFENDANT: Unh-unh [sic],
 

 BY THE COURT: I’m not going to recess this case for you to hire you another lawyer. You could have done it — you’ve had all this time.
 

 BY THE DEFENDANT: I don’t want another lawyer.
 

 BY THE COURT: What do you want to do?
 

 BY THE DEFENDANT: I want to represent myself.
 

 BY THE COURT: Get me Uniform Circuit Court Rules. Get the book. You can have a seat over there. I’m going to instruct you on what kind of problems you’re going to have, and I’ll explain it to you when I have that rule here. Have a seat over there.
 

 BY MR. KILGORE (prosecutor): Judge, before we go back, would you also ask the Defendant not to stand up and do outbursts. He just stood up and yelled before the jury panels.
 

 BY THE COURT: He did what?
 

 BY MR. KILGORE: He stood up and yelled that his attorney was fired in the courtroom.
 

 BY THE COURT: Well, he’s going to have to — if he’s going to represent — I’m going to let him represent himself, but he’s going to have to comply with the rules, but I’ll have to bind him — I’ll gag you if you don’t follow the rules.
 

 All right. Have a seat over there.
 

 
 *548
 
 ¶ 14. The trial judge then excused the jury and explained to Arrington that if he represented himself he would be held to the same standards as a lawyer. The trial judge told Arrington that he had the right to represent himself or to hire a lawyer of his own choosing. “You do not have the right to now come in this courtroom and say you don’t want your lawyer to represent you — the one you hired — and delay the trial of your case.... This case will go forward.” Then Arrington asked to speak privately with his attorney, Everett. After the meeting, Arrington announced to the trial court that he was going to keep Everett as his attorney.
 

 ¶ 15. Arrington claims the trial judge should have specially voir dired the jury concerning Arrington’s statement about his attorney’s bias and then, if necessary, declared a mistrial.
 

 ¶ 16. The only statement the jury might have heard was Arrington’s assertion that his attorney was “biased.” The record as set out above shows the rest of the conversation about Arrington’s dissatisfaction with his lawyer was made at a “conference held at [the] bench out of hearing of [the] jurors.”
 

 ¶ 17. In
 
 Roundtree v. State,
 
 568 So.2d 1173, 1177-78 (Miss.1990), the supreme court stated:
 

 Case law unequivocally holds that the trial judge “is in the best position for determining the prejudicial effect” of an objectionable remark. The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared. Where “serious and irreparable damage” has not resulted, the judge should “admonish the jury then and there to disregard the impropriety.” (Internal citations omitted).
 

 ¶ 18. The determination of whether or not a juror is fair and impartial is a judicial question and will not be set aside unless it is clearly wrong.
 
 Taylor v. State,
 
 672 So.2d 1246, 1264 (Miss.1996) (citation omitted).
 

 ¶ 19. To decide this alleged error we must look at it in the context of the trial. Voir dire was taking place. The State had just finished its voir dire of the jury, and the trial judge called on the defense to begin its voir dire. At that moment, Ar-rington told the trial judge, “Your honor, he is biased. Mr. Bobby Everett is biased.” The trial judge told the parties to approach the bench, and he instructed that a conference among the parties be held outside the hearing of the jurors.
 

 ¶ 20. All of the jurors chosen for the trial swore to the trial judge that they could be fair and impartial and follow their instructions faithfully. There is a presumption that the jury follows the trial court’s instructions.
 
 Payne v. State,
 
 462 So.2d 902, 904 (Miss.1984) (citation omitted).
 

 ¶ 21. If we were to find error and declare a mistrial due to the defendant’s unprovoked outburst, we daresay the whole criminal prosecution system could come to a standstill. At any critical moment in a trial, a defendant could blurt out any type of disruptive statement that would tend to poison the jury. Under Arrington’s theory, a mistrial would be declared and another trial would have to be held on every occasion of an outburst. We will not invite such disorder in to our system of law.
 

 ¶ 22. Further, Arrington did not include the failure to declare a mistrial when he spoke of his “biased” counsel in his motion for a JNOV or new trial. As previously noted, we will not consider matters brought up for the first time on appeal.
 
 Alexander,
 
 904 So.2d at 183 (¶ 26). For
 
 *549
 
 these reasons, we find this allegation of error lacks merit.
 

 III. JNOV/New Trial
 

 ¶ 28. Arrington claims the trial court should have directed a verdict of acquittal at the conclusion of the State’s case or, alternatively, granted his motion for a JNOV or a new trial. Arrington cites no authority in support of this proposition. The supreme court has repeatedly held that the failure to cite any authority is a procedural bar, and a reviewing court is under no obligation to consider the assignment of error.
 
 McClain v. State,
 
 625 So.2d 774, 781 (Miss.1993) (citation omitted). Procedural bar notwithstanding, we find that there was sufficient evidence to support Arrington’s conviction of manslaughter and that the conviction is not against the overwhelming weight of the evidence.
 

 ¶ 24. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we ■will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citation omitted). A motion for a new trial is addressed to a trial court’s discretion, and a new trial should be granted only “in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
 

 ¶ 25. When considering whether evidence is sufficient to support a conviction, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ”
 
 Id.
 
 at 843 (¶ 16) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). If the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the appellate court should reverse and render.
 
 Id.
 
 (citing
 
 Edwards v. State,
 
 469 So.2d 68, 70 (Miss.1985)). But if the evidence is of “such quality and weight that, ‘having in mind the beyond[-]a[-]reasonable[-]doubt[-]burden[-]of[-]proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,’” then the evidence will be considered sufficient.
 
 Id.
 

 ¶ 26. The State called several eyewitnesses to the shooting. The witnesses corroborated each other’s testimony in testifying that Arrington and Shasta argued and Arrington then armed himself with a pistol. The testimony varied on whether Shasta was armed with a knife. Some witnesses said they saw Shasta with a knife, while others testified that he did not have a knife. However, no witness, other than Arrington, testified that Shasta was armed with a knife and used it in a threatening manner toward Arrington during the argument. Valencia, who was standing between Shasta and Arrington, testified that Shasta had a knife, but she was certain Shasta never used it as a weapon and had it by his side when Arrington shot him.
 
 *550
 
 The police department searched for a knife, but never found one.
 

 ¶ 27. Terry Moncrief, who was not related to any of the party goers, testified that he was an eyewitness to the shooting. He said he saw Arrington and Shasta arguing. He then saw Arrington go to his car and retrieve a handgun. Moncrief said he did not see Shasta with any weapon. Moncrief stated Arrington fired one shot into the air and then moved steadily toward Shasta. Arrington pushed the gun in Shasta’s face, and Shasta pushed it out of his face. Moncrief testified that Arring-ton pulled the gun back up and shot Shasta in the neck.
 

 ¶ 28. Velma Page, a party goer unrelated to Shasta’s family, testified that she heard Arrington and Shasta arguing. She said Valencia started pulling Shasta down a hill toward Trina’s house to de-escalate the argument. She further testified that she saw Arrington go to his car, retrieve a silver gun, and start walking toward Shasta. Page saw Arrington shoot the pistol once in the air and then move closer to Shasta. She stated Arrington pushed Valencia out of the way and “pulled the trigger,” shooting Shasta in the neck. Page said she was very close to the shooting, and after Arrington shot Shasta in the neck, she ran to Shasta and took off her shirt in order to apply pressure to Shasta’s bleeding neck wound.
 

 ¶ 29. Valencia testified that after Ar-rington shot the pistol in the air, he continued to move toward her and Shasta at a rapid pace saying: ‘Yeah b* * * *, I got the gun now. What’s up now?” while he was pointing the gun at them. She said Shasta drew the knife, but it fell out of his hand before Arrington got to them. She also stated Arrington and Shasta were face to face, and Arrington was taunting him saying: “B* * * *, I’ll kill you.” Then Shasta slapped the gun out of Shasta’s face, and Arrington said: “If you slap my mother f* * * * * * gun out of your face again, I’ll kill you.” Valencia testified that Shasta responded: “If you gonna do it, do it then,” and Arrington immediately shot Shasta in the neck. Valencia immediately went to her brother’s aide, and Arrington left the scene in his car. The expert witness who performed the autopsy testified that Shasta died of a gunshot wound to an artery in his neck.
 

 ¶ 30. Arrington testified on his own behalf. He stated Shasta came running toward him with a red-handled hunting knife. In response, he jumped up and ran to his car and got a gun. Arrington said by this time, Valencia was trying to hold Shasta back, but he broke away from her and told Arrington that he was not going to shoot “no MF body.” Arrington maintained that Shasta was running at him with the knife and that he shot once in the air to try to back Shasta off. Arrington testified that Shasta did not back off but continued approaching him. Arrington stated he tried to hit Shasta with the gun and when he did, the gun hit Shasta in the jaw and discharged, shooting Shasta behind the ear. Arrington denied that he was trying to shoot Shasta intentionally; rather, Arrington said he was just trying to protect himself.
 

 ¶ 31. The trial judge gave the jury instructions on murder, heat-of-passion manslaughter, and self-defense. The jury found Arrington guilty of manslaughter.
 

 ¶ 32. “The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.” Miss.Code Ann. § 97-3-35 (Rev.2006).
 

 ¶ 33. It is undisputed that Arrington shot Shasta and that Shasta died as a result of his gunshot wound. While Ar-
 
 *551
 
 rington testified at times that he shot Shasta in self-defense and at other times that he accidentally shot him, the jury rejected Arrington’s testimony and instead believed the host of witnesses who stated Arrington shot and killed Shasta without malice but in the heat of passion without authority of law. There is ample evidence in the record to support this verdict. Therefore, we find Arrington’s arguments without merit.
 

 ¶ 34. THE JUDGMENT OF THE NEWTON COUNTY CIRCUIT COURT OF CONVICTION OF MANSLAUGHTER AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NEWTON COUNTY.
 

 LEE, C.J., GRIFFIS, P.J., MYERS, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. IRVING, P.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.